**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

GARY NORMAN, derivatively on behalf of
SAVARA INC.,

     Plaintiff,

     vs.

MATTHEW PAULS, DAVID LOWRANCE,
NEVAN ELAM, RICHARD J. HAWKINS, AN
VAN ES-JOHANSSON, JOSEPH S.
MCCRACKEN, and DAVID A. RAMSAY,

     Defendants,

     and

SAVARA INC.,

     Nominal Defendant.

Case No.: 2:25-cv-06836

**DEMAND FOR JURY TRIAL**

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Gary Norman ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and

on behalf of Nominal Defendant Savara Inc. ("Savara" or the "Company"), files this Verified

Shareholder Derivative Complaint against Matthew Pauls ("Pauls"), David Lowrance

("Lowrance"), Nevan Elam ("Elam"), Richard J. Hawkins ("Hawkins"), An van Es-Johansson

("van Es-Johansson"), Joseph S. McCracken ("McCracken"), and David A. Ramsay ("Ramsay")

(collectively, the "Individual Defendants," and together with Savara, the "Defendants") for

breaches of their fiduciary duties as directors and/or officers of Savara, unjust enrichment, abuse

of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the

Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b)

and 21D of the Exchange Act against Defendants Pauls and Lowrance. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Savara, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Savara's directors and officers from March 7, 2024 to May 23, 2025, inclusive (the "Relevant Period").

2.      Savara is a Pennsylvania-based biopharmaceutical company focused on developing drugs for rare respiratory diseases. Savara states that its goal is to "become a leader in rare respiratory disease therapeutics through the development and commercialization of novel, best-in-class medicines that address unmet medical needs in this field."

3.      Savara's leading respiratory treatment, molgramostim, also known as MOLBREEVI, is an inhaled granulocyte macrophage colony-stimulation factor ("GM-CSF") being developed to treat autoimmune pulmonary alveolar proteinosis ("aPAP"). aPAP occurs when there is a buildup of a substance called surfactant on the air sacs of the lungs as a result of the immune system producing antibodies which block the production of GM-CSF. GM-CSF helps prevent the buildup of surfactant in the lungs and as a result of the body blocking GM-CSF

production, patients experience problems getting oxygen into the body which can lead to shortness of breath fatigue and a chronic cough.

4.      Leading up to, and during the Relevant Period, MOLBREEVI was in a Phase 3 IMPALA-2 pivotal clinical trial. In December 2024, due to the success of the Phase 3 IMPALA-2 clinical trial, the Company began a rolling submission of a Biologics License Application ("BLA") for MOLBREEVI. A BLA is required to obtain approval by the U.S. Food and Drug Administration ("FDA") in order for Savara to distribute MOLBREEVI across state lines. In order to complete a BLA, the Company must submit, *inter alia*, information regarding the drugs chemistry, manufacturing, and controls ("CMC") to the FDA. In order to comply with the CMC requirement of a BLA, companies must provide a detailed account of the drug's manufacturing process, including stability testing, quality control procedures, and the analytical method used for validation.

5.      Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements, pertaining to the timing at which MOLBREEVI would complete the BLA. For example, on December 18, 2024, the Company issued a press release titled "Savara Initiates Rolling Submission of a Biologics License Application (BLA) to the U.S. Food and Drug Administration (FDA) for MOLBREEVI* for the Potential Treatment of Autoimmune Pulmonary Alveolar Proteinosis (aPAP)" (the "MOLBREEVI BLA Announcement Press Release"). The MOLBREEVI BLA Announcement Press Release touted the results of MOLBREEVI's clinical trial, stating that "[g]iven the positive results of the pivotal, Phase 3 IMPALA-2 trial, we believe MOLBREEVI demonstrates a favorable benefit-risk profile and could fundamentally change the way aPAP is treated." The MOLBREEVI BLA Announcement Press Release also provided investors with a timeline of when the BLA was

expected to be completed, representing that the Company "expect[ed] to complete the submission

of the rolling [MOLBREEVI] BLA by the end of [the first quarter of] 2025."

6.    Additionally, on May 13, 2025, the Company issued a press release reporting its

financial results for the first quarter of 2025 (the "1Q 2025 Earnings Press Release"). The 1Q 2025

Earnings Press Release stated, in relevant part:

> At the end of 1Q 2025, we announced the on-time submission of the MOLBREEVI
> BLA to the FDA for the treatment of autoimmune PAP and requested priority
> review," said [Defendant] Pauls[.] "If Priority Review is granted, we anticipate a
> PDUFA date by the end of the year and are preparing for a U.S. commercial launch
> in early 2026. We are also on track to submit the MAA in both Europe and the U.K.
> by the end of the year. Lastly, with approximately $172.5 million in cash, and the
> optionality to further finance the company through access to low-cost capital from
> our recent debt financing, we are in a strong financial position and believe our
> current cash runway extends into 2H 2027, well beyond a U.S. launch.

7.    The truth emerged on May 27, 2025, when the Company issued a press release

titled "Savara Receives Refusal to File (RTF) Letter From the U.S. Food and Drug Administration

(FDA) for the Biologics License Application (BLA) for MOLBREEVI* to Treat Patients With

Autoimmune Pulmonary Alveolar Proteinosis (autoimmune PAP)" (the "RTF Press Release").

The RTF Press Release revealed that the FDA had determined that MOLBREEVI's BLA was

incomplete and issued a Refusal To File letter to Savara. The RTF Press Release further revealed

that the FDA required more information on MOLBREEVI's CMC process in order to complete

the application. Specifically, the RTF Press Release stated, in relevant part:

> Savara [. . .] today announced that the Company received an RTF letter from the
> FDA for the BLA of MOLBREEVI as a therapy to treat patients with autoimmune
> PAP. Upon preliminary review, the FDA determined that the BLA submitted in
> March 2025 was not sufficiently complete to permit substantive review and
> requested additional data related to Chemistry, Manufacturing, and Controls
> (CMC). The RTF was not the result of safety concerns, and the FDA did not request
> or recommend additional efficacy studies. Within the next 30 days, the Company
> intends to request a Type A meeting with the Agency. Typically, Type A meetings
> are granted by the FDA within 30 days of the request.

8.      On this news, the price of the Company's stock fell $0.90 per share, or approximately 31.7%, from a close of $2.84 per share on May 23, 2025, to close at $1.94 per share on May 27, 2025.

9.      During the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by making and/or causing the Company to make a series of materially false and misleading statements which failed to disclose, *inter alia*, that: (1) the BLA for MOLBREEVI lacked the CMC information that is required to complete the application; (2) as a result, the FDA was unlikely to approve the BLA for MOLBREEVI; (3) the timeframe in which the Individual Defendants represented to investors that BLA for MOLBREEVI would be approved was unrealistic; (4) as a result of the delay of MOLBREEVI's BLA approval, there was an increased likelihood that the Company would need to raise additional capital; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Omnibus Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

10.      Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while three of the Individual Defendants engaged in improper insider sales, netting total proceeds of ***approximately $666,061.***

11.      The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12.      The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") and Chief Administrative Officer ("CAO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Pennsylvania (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged because of the Individual Defendants' knowing or reckless breaches of their fiduciary duties, and other misconduct.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Pauls' and Lowrance's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he or she is an individual who is a citizen of Pennsylvania or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

20.     Plaintiff is a current shareholder of Savara. Plaintiff has continuously held Savara common stock since first purchasing on March 4, 2024.

### Nominal Defendant Savara

21.     Savara is a Delaware corporation with principal executive offices at 1717 Langhorne Newtown Road, Suite 300, Langhorne, Pennsylvania, 19047. Savara's common stock trades on the Nasdaq Global Market ("Nasdaq") under the ticker symbol "SVRA."

### Defendant Pauls

22.    Defendant Pauls has served as the Company's CEO since December 2020, the Chair of the Board since September 2020, and as a Company director since April 2017.

23.    During the Relevant Period, while the Company's stock was artificially inflated before the scheme was exposed, Defendant Pauls made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| December 13, 2024 | 92,593 | $3.21 | $297,224 |
| December 16, 2024 | 54,702 | $3.31 | $180,828 |

Thus, in total, before the fraud was exposed, Defendant Pauls sold 147,295 shares of Company common stock on inside information, for which he received approximately $478,052 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

24.    The Schedule 14A the Company filed with the SEC on April 25, 2025 (the "2025 Proxy Statement") stated the following about Defendant Pauls:

*Matthew Pauls*. Mr. Pauls has served as our Chief Executive Officer since December 2020, the Chair of our Board of Directors since September 2020, and was our Interim Chief Executive Officer from September 2020 to December 2020. Mr. Pauls has served as a member of our Board of Directors since April 2017 and was a member of the board of directors of Mast Therapeutics, Inc. from October 2015 to April 2017. Previously, Mr. Pauls was the founder of Spartan Biopharma Insights, LLC, where he provided strategic advisement to institutional investors, and company management teams on investment thesis assessment, capitalization strategy, mergers and acquisitions, clinical execution, and commercialization from December 2019 to September 2020. Since August 2023, Mr. Pauls has served on the board of directors of Soleno Therapeutics, Inc. (Nasdaq: SLNO), a clinical-stage biopharmaceutical company developing novel therapeutics for rare diseases, as well as the board of directors of the privately held companies Amplo Biotechnology, Inc., a gene therapy company focused on rare neuromuscular disorders, and Pelthos Therapeutics, a biopharmaceutical company focused on

dermatologic infectious diseases. Mr. Pauls served on the board of directors of Zyla Life Sciences (previously Egalet Corporation) (OTCQX: ZCOR), a commercial-stage life sciences company with a portfolio of medicines for pain and inflammation, from January 2019 until its merger with Assertio Therapeutics, Inc. in May 2020. From August 2014 to November 2019, Mr. Pauls served as President and Chief Executive Officer of Strongbridge Biopharma plc (Nasdaq: SBBP) ("Strongbridge"), a biopharmaceutical company focused on therapies that target rare diseases that Mr. Pauls led through an initial public offering. He also served as a member of the board of directors of Strongbridge from September 2015 to November 2019. From April 2013 to August 2014, Mr. Pauls was Chief Commercial Officer of Insmed, Inc. (Nasdaq: INSM), a publicly traded global biopharmaceutical company focused on rare diseases. From 2007 to April 2013, Mr. Pauls worked at Shire Pharmaceuticals, a global specialty biopharmaceutical company, most recently as Senior Vice President, Head of Global Commercial Operations from May 2012 to April 2013. Earlier in his career, from 1997 to 2007, Mr. Pauls held senior positions at Bristol-Myers Squibb in Brand Management and Payor Marketing and at Johnson & Johnson in various U.S. and global commercial roles. Mr. Pauls holds B.S. and M.B.A. degrees from Central Michigan University and a J.D. from Michigan State University College of Law. We believe Mr. Pauls' experience as our Chief Executive Officer, as well as his leadership experience and extensive commercialization, strategic planning and operations experience in the biopharmaceutical industry, particularly with therapies for rare diseases, qualify him to serve as a member of the Board of Directors.

**Defendant Lowrance**

25.    Defendant Lowrance has served as the Company's CFO and CAO since December 2022.

26.    During the Relevant Period, while the Company's stock was artificially inflated before the scheme was exposed, Defendant Lowrance made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| December 13, 2024 | 24,350 | $3.21 | $78,164 |
| December 16, 2024 | 25,000 | $3.33 | $83,278 |

Thus, in total, before the fraud was exposed, Defendant Lowrance sold 49,350 shares of Company common stock on inside information, for which he received approximately $161,441 in total

proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

27.    The 2025 Proxy Statement stated the following about Defendant Lowrance:

***David Lowrance***. Mr. Lowrance has served as our Chief Financial & Administrative Officer since December 2022 and Secretary since July 2017, and he served as our Chief Financial Officer from November 2016 to December 2022. From September 2014 to October 2016, Mr. Lowrance served as the Chief Financial Officer and Treasurer of Edgemont Pharmaceuticals, a fully-integrated specialty pharmaceutical company with multiple marketed products in the CNS space. From April 2011 to September 2014, Mr. Lowrance served as the Chief Financial Officer and Secretary of Acucela Inc. ("Acucela"), a clinical stage biotechnology company that specializes in ophthalmic therapeutics, where he was responsible for overseeing all aspects of Acucela's day-to-day operations, business development and growth endeavors, investor relations and corporate communications. While at Acucela, Mr. Lowrance helped lead a $162 million international initial public offering, with a listing on the Tokyo Stock Exchange. From March 2003 to April 2011, Mr. Lowrance was Vice President and Chief Financial Officer of Cumberland Pharmaceuticals Inc. (Nasdaq: CPIX), a specialty pharmaceutical company focused on commercializing branded prescription products, where he oversaw all aspects of finance and accounting, business and growth strategy and product development. Mr. Lowrance, a CPA, holds a B.B.A. in Accounting from the University of Georgia.

**Defendant Elam**

28.    Defendant Elam has served as a Company director since February 2009. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Governance Committee.

29.    The 2025 Proxy Statement stated the following about Defendant Elam:

***Nevan Elam***. Mr. Elam has served as a member of our Board of Directors since February 2009. Since February 2013, Mr. Elam has served as a member of the Board of Directors as well as the President and Chief Executive Officer of Rezolute, Inc. (Nasdaq: RZLT) ("Rezolute"), a biopharmaceutical company focused on developing therapies for metabolic diseases with serious unmet needs. Prior to his tenure at Rezolute, Mr. Elam held senior executive roles within the pharmaceutical industry, including Senior Vice President and Head of the Pulmonary Business Unit of Nektar Therapeutics and President and Chief Executive Officer of a European medical device company. Earlier in his career, he

was a co-founder and the Chief Financial Officer of E2open, Inc. and a Partner in the corporate practice of the law firm of Wilson Sonsini Goodrich & Rosati, P.C. In addition, from November 2022 to June 2023, Mr. Elam served on the board of directors of Peak Bio, Inc. (OTCPK: PKBO). Mr. Elam received his J.D. from Harvard Law School and a B.A. from Howard University. We believe Mr. Elam's broad experience with pharmaceutical companies, including advising them of their unique legal and regulatory obligations, qualifies him to serve on the Board of Directors.

**Defendant Hawkins**

30.      Defendant Hawkins has served as a Company director since October 2010. He also serves as a member of the Audit Committee.

31.      During the Relevant Period, while the Company's stock was artificially inflated before the scheme was exposed, Defendant Hawkins made the following sales of Company common stock.

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|------|------------------|----------------------|--------------|
| December 16, 2024 | 8,000 | $3.32 | $26,569 |

Thus, in total, before the fraud was exposed, Defendant Hawkins sold 8,000 shares of Company common stock on inside information, for which he received approximately $26,569 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

32.      The 2025 Proxy Statement stated the following about Defendant Hawkins:

***Richard J. Hawkins***. Mr. Hawkins has served as a member of our Board of Directors since October 2010. Mr. Hawkins currently serves on the board of directors of several privately held life sciences companies, as well as Plus Therapeutics Inc. (formerly Cytori Therapeutics, Inc.) (Nasdaq: PSTV), and previously served on the board of directors of SciClone Pharmaceuticals, Inc. until its acquisition in October 2017. Mr. Hawkins served as Chief Executive Officer and Chair of the Board of Directors of Lumos Pharma, Inc., a clinical stage biotechnology company focused on bringing novel therapies to patients with severe, rare, and genetic diseases, whose medical needs are unmet, from September

2010 until its acquisition in December 2024. Prior to his tenure with Lumos Pharma, Inc., Mr. Hawkins founded and advised numerous pharmaceutical companies including Sensus, where he served as co-founder and Chair of the Board of Directors until it was sold to Pfizer in 2001. From 1981 to 2000, Mr. Hawkins was founder, President and Chief Executive Officer of Pharmaco where he guided the company's growth to more than 2,000 employees. Pharmaco later merged with PPD of Wilmington, North Carolina to form PPD Pharmaco, one of the largest clinical contract research organizations in the world. Mr. Hawkins received his B.S. in Biology from Ohio University. We believe Mr. Hawkins' experience in the pharmaceutical and life sciences industries as well as his broad management experience qualify him to serve on the Board of Directors.

**Defendant van Es-Johansson**

33.    Defendant van Es-Johansson has served as a Company director since December 2019. She also serves as a member of the Audit Committee and the Compensation Committee.

34.    The 2025 Proxy Statement stated the following about Defendant Es-Johansson:

***An van Es-Johansson***. Dr. An van Es-Johansson has served on our Board of Directors since December 2019. Dr. van Es-Johansson has served on the board of directors of Plus Therapeutics, Inc. (Nasdaq: PSTV) since January 2020, and she previously served on the boards of directors of Lumos Pharma, Inc. from February 2021 until its acquisition in December 2024, and the private company Agendia BV from 2019 until June 2024. From March 2021 until December 2024, Dr. van Es-Johansson served as a senior advisor to Sinfonia Pharma, a Swedish pharmaceutical company with a primary focus on neurological diseases. She was previously the Chief Medical Officer and Head of Development for AlzeCure Pharma from September 2018 to March 2021. From May 2005 to September 2018, Dr. van Es-Johansson served in a range of executive roles of increasing responsibility at Sobi, an international rare disease company headquartered in Stockholm, Sweden, including as Vice President and Head of EMENAR Medical Affairs for Specialty Care and Partner Products from March 2013 to January 2018. Prior to her time at Sobi, Dr. van Es-Johansson served in leadership positions at large pharmaceutical and smaller biotechnology companies, including Roche, Eli Lilly, Active Biotech, and BioStratum. From 2004 to 2016 she was a member of the Scientific Advisory Board for Uppsala Bio. Dr. van Es-Johansson received a M.D. from Erasmus University, Rotterdam, The Netherlands. We believe Dr. van Es-Johansson's medical knowledge and experience in the pharmaceutical industry qualifies her to serve on the Board of Directors.

**Defendant McCracken**

35.    Defendant McCracken has served as a Company director since October 2013 and as Lead Independent Director since December 2019. He also serves as the Chair of the Nominating and Governance Committee and as a member of the Compensation Committee.

36.    The 2025 Proxy Statement stated the following about Defendant McCracken:

***Joseph S. McCracken***. Dr. McCracken has served as our Lead Independent Director since December 2019 and a member of our Board of Directors since October 2013. Since September 2013, Dr. McCracken has advised biopharmaceutical companies on the design and implementation of corporate strategy and business development initiatives. Dr. McCracken also serves on the board of directors of Modalis Therapeutics Corporation (TSE: 4883.T), as well as the board of directors of the privately held company Eos Therapies. Dr. McCracken previously served on the boards of directors of Lumos Pharma, Inc. until its acquisition in December 2024, Kindred Biosciences, Inc. until its acquisition in August 2021, and Alkahest, Inc. until its acquisition by Grifols SA in December of 2020. From July 2011 to September 2013, Dr. McCracken was Vice President and Global Head of Business Development & Licensing for Roche Pharma, a research-focused healthcare company, where he was responsible for Roche Pharma's global in-licensing and out-licensing activities. From October 2009 until July 2011, he was General Manager, Roche Pharma Japan & Asia Regional Head, Roche Partnering. Prior to joining Roche Pharma, Dr. McCracken held the position of Vice President, Business Development at Genentech for more than nine years, and previously held similar positions at Aventis Pharma and Rhone-Poulenc Rorer. Dr. McCracken holds a B.S. in Microbiology, an M.S. in Pharmacology and a D.V.M. from The Ohio State University. We believe Dr. McCracken's extensive experience in the biotechnology and pharmaceutical industries qualifies him to serve on the Board of Directors.

**Defendant Ramsay**

37.    Defendant Ramsay has served as a Company director since April 2017. He also serves as the Chair of the Audit Committee.

38.    The 2025 Proxy Statement stated the following about Defendant Ramsay:

***David A. Ramsay***. Mr. Ramsay has served as a member of our Board of Directors since April 2017 and as a member of the Board of Directors of Mast Therapeutics, Inc. from June 2011 to April 2017. Mr. Ramsay serves on the board of directors of Exuma Biotech, Inc., a privately held biotechnology company, and served on the board of directors of La Jolla Pharmaceutical Company from September 2019 until its acquisition by Innoviva, Inc. in August 2022. Mr. Ramsay served as Senior Vice President and Chief Financial Officer of Bonti, Inc., a private, clinical stage biotechnology company focused on the development and commercialization of

neurotoxin products for therapeutic and aesthetic applications, from February 2018 until its acquisition by Allergan plc in October 2018. Mr. Ramsay served as Chief Financial Officer of Halozyme Therapeutics, Inc. (Nasdaq: HALO), a biotechnology company developing and commercializing novel oncology therapies, from 2003 to 2009 and from May 2013 until his retirement in July 2015. He also served as Halozyme's Vice President, Corporate Development from May 2009 to May 2013. From 2000 to 2003, Mr. Ramsay was Vice President, Chief Financial Officer of Lathian Systems, Inc., a provider of technology-based sales solutions for the life science industry. From 1998 to 2000, he served as Vice President, Treasurer and Director, Corporate Finance of Valeant Pharmaceuticals International, Inc. (formerly ICN Pharmaceuticals, Inc.), a multinational specialty pharmaceutical company. Mr. Ramsay began his career at Deloitte & Touche, where he obtained his CPA license. Mr. Ramsay holds a B.S. in business administration from the University of California, Berkeley and an M.B.A. with a dual major in finance and strategic management from The Wharton School at the University of Pennsylvania. We believe Mr. Ramsay's significant experience as chief financial officer of life science companies, particularly his experiences at Halozyme during its successful development and its commercialization of its first products, and at a large audit and financial advisory firm, qualify him to serve on the Board of Directors.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

39.     By reason of their positions as officers, directors, and/or fiduciaries of Savara and because of their ability to control the business and corporate affairs of Savara, the Individual Defendants owed Savara and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Savara in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Savara and its shareholders so as to benefit all shareholders equally.

40.     Each director and officer of the Company owes to Savara and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

41.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Savara, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

42.     To discharge their duties, the officers and directors of Savara were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

43.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Savara, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company, has been ratified by the remaining Individual Defendants, who collectively comprised a majority of Savara's Board at all relevant times.

44.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false

information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

45.    To discharge their duties, the officers and directors of Savara were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Savara were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Pennsylvania, and the United States, and pursuant to Savara's own Code of Business Conduct and Ethics (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Savara conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Savara and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Savara's operations would comply with all applicable laws and Savara's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

46.    Each of the Individual Defendants further owed to Savara and the shareholders the duty of loyalty requiring that each favor Savara's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

47.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Savara and were at all times acting within the course and scope of such agency.

48.    Because of their advisory, executive, managerial, directorial, and controlling positions with Savara, each of the Individual Defendants had access to adverse, non-public information about the Company.

49.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Savara.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

52.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Savara was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

54.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Savara and was at all times acting within the course and scope of such agency.

## SAVARA'S CODE OF ETHICS

55.     According to the Company's Code of Ethics, "[Savara] is committed to honesty and accountability as the cornerstones of the way it does business and expects all employees, officers and directors of the Company to conduct all Company business in an ethical and legal manner."

56.     In a section titled "Introduction – General Statement of Company Policy," the Code of Ethics states, in relevant part:

> This Code of Business Conduct and Ethics (this "Code") covers a wide range of business practices, procedures and principles of behavior that support the commitment of Savara Inc. and its subsidiaries (collectively, the "Company") to conduct business within the confines of applicable law and by high ethical standards. The Company expects every employee, officer and director to read and understand this Code and abide by it in performance of his or her business responsibilities. Employees are also expected to seek to have all agents and contractors conform to Code standards when working for or on behalf of the Company.
>
> ***
>
> Your personal integrity and good judgment are essential to ensuring the Company conducts its business in a lawful and ethical manner at all times. In general, the Company expects you to:

- comply with applicable laws, rules, and regulations;

- conduct all dealings with the Company's vendors, collaborators, suppliers, customers and competitors fairly, with honesty and integrity;

- avoid actual and foreseeable conflicts of interest with the Company;

- produce or support others in producing full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission (the "SEC") and in other public communications;

- protect information, in any form, that belongs to the Company, its vendors, collaborators, suppliers, customers and competitors consistent with contractual obligations and professional standards;

- protect the Company's assets and ensure their efficient use and report any suspected fraud or theft immediately; and

- never use your position with the Company or Company assets or information for improper personal gain.

\*\*\*

If you violate this Code, you will be subject to disciplinary action, up to and including immediate termination of your employment or other relationship with the Company.

57.     In a section titled "Lawful and Ethical Behavior," the Code of Ethics states, in relevant part:

Obeying the law, both in letter and in spirit, is the foundation on which this Code is built. The Company expects you to respect and conduct business in accordance with applicable laws of the cities, states and countries in which the Company operates. Although you are not expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors or the Compliance Officer. In addition, the Company's policy demands that you adhere to high standards of business ethics and conduct.

\*\*\*

If you remain uncertain about what to do, if you need advice, or if you have reason to believe that a domestic or foreign law could be violated in connection with Company business or that this Code has been violated in any way, report your concern immediately pursuant to the procedures described in Section 17 below.

58.     In a section titled "Code of Ethics," the Code of Ethics states the following, in relevant part:

> This Code of Ethics is promulgated by the Company's Board of Directors (the "Board") under section 406 of the Sarbanes Oxley Act of 2002 and the related rules of the SEC and applies to all employees, officers and directors and of the Company. It contains standards reasonably necessary to promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships; full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the issuer and in other public communications; and compliance with applicable governmental laws, rules and regulations. It should be read in conjunction with the rest of this Code.
>
> You must:
>
> • Act with honesty and integrity, ethically handling actual or apparent conflicts of interest in personal and professional relationships. You should recognize that even the appearance of a conflict of interest can damage the Company. A conflict of interest may exist because of a relationship of yours or of a family member that is inconsistent with the Company's best interests or could cause a conflict with your ability to perform your job responsibilities.
>
> • Report to the Compliance Officer any transaction that reasonably could be expected to give rise to a conflict of interest.
>
> • Produce, or cause to produced, full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the SEC and in other public communications.
>
> • Comply with applicable governmental laws, rules and regulations.
>
> • Promptly report any violation of this Code of Ethics to the Compliance Officer.
>
> • Proactively promote ethical behavior by other Company officers and employees involved in financial reporting.
>
> The Company reserves the right to determine when actual or potential conflicts of interest exist, and then to take any action, which in the sole judgment of the Company, is needed to prevent the conflict from continuing.
>
> You will be held accountable for your adherence to this Code of Ethics. Your failure to observe the terms of this Code of Ethics may result in disciplinary action, up to and including immediate termination of your employment.

Any request by you for a waiver of any provision of this Code of Ethics must be in writing and addressed to the Compliance Officer, unless you are a senior financial officer (the Company's principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions are "senior financial officers" for purposes of this Code of Ethics), other executive officer or director, in which case it must be addressed to the Chair of the Audit Committee.

With regard to senior financial officers, other executive officers and directors, the Board will have the sole and absolute discretionary authority, acting upon such recommendation as may be made by the Audit Committee, to approve any waiver with respect to this Code of Ethics. Any waiver for senior financial officers, other executive officers or directors with respect to this Code of Ethics will be disclosed promptly on Form 8-K or any other means that complies with SEC rules or applicable securities exchange listing standards.

59.    In a section titled "Accurate and Timely Books and Records," the Code of Ethics

states the following:

The Company requires that its corporate and business records be completed accurately and in a timely manner. The integrity of the Company's financial statements and public disclosure depends on the accuracy and completeness of all supporting financial information, including the Company's books of account. The making of false or misleading entries, whether they relate to financial results or otherwise, is both illegal and unethical. You must act in a manner that helps to ensure all of the Company's books, records, accounts and financial statements are maintained in reasonable detail, appropriately reflect the Company's transactions, and conform both to applicable legal requirements and to the Company's system of internal controls. You must execute and record transactions in accordance with all of the Company's internal control procedures. All of your expense reimbursements must accurately reflect the true nature and amount of the expenses. No entry may be made in the Company's books and records that intentionally hides or disguises the nature of any transaction or liability of the Company or misclassifies any transactions as to accounts or accounting periods. No cash or other assets may be maintained for any purpose in any unrecorded or "off-the-books" fund.

If you are in any way involved in preparing or verifying reports that the Company files with or submits to the SEC or other public communications (such as press releases), you must help to ensure that such reports and other documents provide full, fair, accurate, timely and understandable disclosure and fairly present the Company's financial condition and results of operations.

It is very important that you do not create or perpetuate, or participate in the creation or perpetuation of, any records that are intended to mislead anyone or conceal any improper act or conduct.

If you become aware of any departure from these standards, you have a responsibility to report it immediately pursuant to the procedures described in Section 17 below.

60.    In a section titled "Conflicts of Interest," the Code of Ethics states, in relevant part:

The Company respects the rights of its employees, officers and directors to manage their personal affairs and investments and does not wish to impinge on their personal lives. At the same time, you should avoid business or financial interests and personal activities that may give rise to a conflict of interest. A "conflict of interest" occurs when an individual's personal interests interfere in any way with the interests of the Company. A conflict of interest can arise whenever you, as an employee, officer or director, take action or have an interest that may make it difficult to perform your Company responsibilities objectively and effectively. Conflicts of interest also arise when you or a member of your family receive an improper personal benefit as a result of your position in the Company. The basic factor in all conflicts of interest situations is the division of loyalty between the Company's interests and your personal interests. Even the appearance of a conflict of interest where none actually exists can be damaging to you and/or the Company and should be avoided.

***

While it is not possible to identify every activity or relationship that is, or may result in, a conflict of interest, or the appearance of one, if you or your family members are engaged in any of the activities listed below, then there may be a conflict of interest, and you must disclose the facts concerning the activity or relationship (as described above) in order to have the Company address the situation:

• any employment or consulting relationship with, or any service on the board of directors or any advisory board of, any entity that does business, seeks to do business or competes with the Company;

• any ownership interest in any entity that does business, seeks to do business or competes with the Company (other than nominal amounts of securities in publicly traded companies and ownership interests resulting from ownership interests in mutual funds);

• any activity that harms or interferes with a relationship or potential relationship between the Company and any entity with which the Company does business or seeks to do business;

● any business activity that is competitive with the Company's business;

● any outside employment, consulting or other activity of any type that calls into question your ability to devote appropriate time and attention to your duties and responsibilities to the Company;

● any direct supervisory, review or other influential position on the job evaluation, pay or benefits of any close relative;

● any sales or purchases of anything to or from the Company (unless it is pursuant to a routine program that is offered to all employees in general); and

● any situation in which, without proper authorization, you are required or tempted to disclose, or do disclose, any trade secret, confidential or proprietary information or intellectual property of the Company.

The Company reserves the right to determine when actual or potential conflicts of interest exist, and then to take any action, which in the sole judgment of the Company, is needed to prevent the conflict from continuing. Such action may include, but is not limited to, having you discontinue the conflicting activity or relationship, divest the conflicting interest and/or return the benefit or gain received, to realign your duties and responsibilities, or disciplinary action, up to and including immediate termination of your employment.

61.    In a section titled "Compliance Procedures; Reporting Violations," in a subsection titled "Communication of this Code; Monitoring Compliance," the Code of Ethics states, in relevant part:

The Company will monitor compliance with this Code under the supervision of the Audit Committee and Compliance Officer and, when appropriate, impose and enforce appropriate disciplinary measures for violations of this Code. You are required to cooperate fully with any audits for compliance with this Code and to provide truthful and accurate responses to any request. Any failure to provide such cooperation or responses will result in disciplinary action, up to and including termination of your relationship with the Company.

62.    In violation of the Code of Ethics, the Individual Defendants (as key officers and/or as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law,

including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate

assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of

Ethics, the Individual Defendants failed to comply with laws and regulations, conduct business in

an honest and ethical manner, and properly report violations of the Code of Ethics.

## AUDIT COMMITTEE CHARTER

63.    The Company also maintains an Audit Committee Charter. Under a section titled

"Purpose," the Audit Committee Charter states the following about the Audit Committee's main

purpose:

> The primary purpose of the Audit Committee (the "Committee") of the board of
> directors (the "Board") of Savara Inc. (the "Company") is to oversee the accounting
> and financial reporting processes of the Company, including its internal controls
> system, and audits of its financial statements. Notwithstanding the foregoing,
> however, the Committee is not responsible for planning or conducting audits,
> determining whether the Company's financial statements are complete and accurate
> or in accordance with generally accepted accounting principles, or determining
> whether the Company's internal control over financial reporting is effective.

64.    Under a section titled "Responsibilities," the Audit Committee Charter outlines the

Audit Committee's responsibilities, in relevant part as:

> The Committee is charged by the Board with the responsibility to:
>
> ***
>
> 6. Meet with management and the independent auditor, together and separately, to
> discuss the annual financial statements and the report of the independent auditor
> thereon, and to discuss significant issues encountered in the course of the audit
> work, including: restrictions on the scope of activities; access to required
> information; the adequacy of internal controls, including any special audit steps
> adopted in light of any significant deficiencies or material weaknesses in the design
> or operation of internal control over financial reporting identified during the course
> of the annual audit, any fraud, whether or not material, that involves management
> or other employees or consultants who have a significant role in the Company's
> internal controls structure and procedures for financial reporting, and the adequacy
> of disclosures about changes in internal control over financial reporting; the
> adequacy of the disclosure of off-balance sheet transactions, arrangements,
> obligations and relationships in reports filed with the Securities and Exchange
> Commission (the "SEC"); and the appropriateness of the presentation of any non-

GAAP financial measures (as defined in the rules and regulations promulgated by the SEC (the "Regulations")) included in any report filed with the SEC or in any public disclosure or release.

7. Review and discuss with management and the independent auditor management's report on internal control over financial reporting, and, if applicable, the independent auditor's audit of the effectiveness of the Company's internal control over financial reporting and its attestation report, if any, prior to the filing of the Company's annual report on Form 10-K.

8. Following such review and discussions, if so determined by the Committee, recommend to the Board that the annual financial statements be included in the Company's annual report on Form 10-K.

9. Meet quarterly with management and the independent auditor to discuss the quarterly financial statements prior to the filing of the Company's quarterly report on Form 10-Q; provided that this responsibility may be delegated to the chair of the Committee or a member of the Committee who is a financial expert; provided, further, that if the responsibility to meet quarterly with management and the independent auditor is delegated, the Committee itself shall still meet at least quarterly.

10. Meet at least once each year in separate executive sessions with management, the internal auditor, if any, and the independent auditor to discuss matters that any of them or the Committee believes could significantly affect the Company's financial statements and should be discussed privately.

11. Have such direct and independent interaction with members of management, including the Company's principal financial officer and principal accounting officer, as the Committee believes appropriate.

12. Review significant changes to the Company's accounting principles and practices proposed by the independent auditor, the internal auditor, if any, or management.

***

16. Periodically review with management and evaluate any significant financial risk exposures facing the Company and the steps management has taken to control and monitor such exposures.

***

18. Conduct or authorize such inquiries into matters within the Committee's scope of responsibility as the Committee deems appropriate.

19. Prepare the Committee report required by the Regulations to be included in the Company's proxy statement for its annual meeting of stockholders.

\*\*\*

23. Oversee the implementation and enforcement of the Company's policy regarding trading in stock and other securities of the Company and the disclosure of such transactions, including reviewing reports prepared by any compliance officer designated under such policy regarding ongoing compliance matters and disciplinary actions under such policy.

65.     In violation of the Audit Committee Charter, the Individual Defendants failed to adequately review and discuss the Company's annual and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

66.     Savara is a Pennsylvania-based biopharmaceutical company focused on developing treatments for rare respiratory diseases. Savara states that its goal is to "become a leader in rare respiratory disease therapeutics through the development and commercialization of novel, best-in-class medicines that address unmet medical needs in this field."

67.     Savara's leading respiratory medicine, MOLBREEVI, is being developed to treat aPAP, which is a rare lung disease resulting from a buildup of surfactant in the air sacs of the lungs. The buildup of surfactant causes issues getting oxygen into the body and can lead to shortness of breath, fatigue, chronic cough, and hypoxemic respiratory failure. The root cause of aPAP is an autoimmune response causing the body to deplete its GM-CSF. GM-CSF is a protein occurring in the body which clears surfactant from the air sacs in the lungs.

68.     MOLBREEVI is an inhaled formula which treats aPAP by activating macrophages in the lung's air sacs, potentially restoring the surfactant-clearing activity of the alveolar macrophages and considerably improving oxygen flow into the body.

69.     Leading up to and during the Relevant Period, MOLBREEVI was in a Phase 3 IMPALA-2 pivotal clinical trial. During the clinical trial process, a company can apply for a BLA. BLA approval by the FDA is required in order to distribute a biologic product across state lines, and the BLA requires that the company disclose the product's CMC. Specifically, the BLA must disclose the product's manufacturing process, such as stability testing, analytical method validation, and process validation test runs. The FDA also requires further disclosure regarding the company's facilities, equipment, and quality control processes.

**False and Misleading Statements**

*March 7, 2024 Financial Reports*

70.     The Relevant Period began on March 7, 2024, when the Company filed its Annual Report on Form 10-K with the SEC for the 2023 fiscal year (the "2023 Form 10-K"). The 2023 Form 10-K was signed by Defendants Pauls, Lowrance, Elam, Hawkins, van Es-Johansson, McCracken, and Ramsay. The 2023 Form 10-K also included certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Pauls and Lowrance attesting to the accuracy of the 2023 Form 10-K and that the 2023 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

71.     The 2023 Form 10-K represented Savara management's strong capabilities to advance products through regulatory processes, stating "[o]ur management team has significant

experience in orphan drug development and pulmonary medicine, identifying unmet needs, and

***effectively advancing product candidates to approval and commercialization***."[1]

72.    The 2023 Form 10-K also provided investors with an update on the MOLBREEVI

clinical trial, stating, in relevant part:

> Our goal is to become a leader in rare respiratory therapeutics through the
> development and commercialization of novel, best-in-class medicines that address
> unmet medical needs in this field. Key elements of our strategy include:
>
> **• Continued advancement of the molgramostim aPAP program and the Phase
> 3 IMPALA-2 pivotal clinical trial.** The IMPALA-2 trial design has been endorsed
> by regulatory authorities in the U.S. (FDA), Europe [], United Kingdom Medicines
> and Healthcare Products Regulatory Agency [], and Japan [], and regulatory and
> ethics committees in various countries and sites where the trial is being conducted.
> The dosing of the first patient was initiated in June 2021. During the second quarter
> of 2023, patient enrollment in the trial was completed (target enrollment was 160,
> the trial enrolled 164 patients) with top line results expected to be reported at the
> end of the second quarter of 2024.

73.    The 2023 Form 10-K also touted MOLBREEVI's "key advantages," stating, in

relevant part:

> Based on data from the completed Phase 2/3 IMPALA trial and building upon the
> published investigator-sponsored treatment experience with inhaled GM-CSF, we
> believe molgramostim has the potential to become the treatment of choice for
> aPAP. The following characteristics of molgramostim may contribute to the clinical
> profile of the investigational product candidate, as well as facilitate potential
> regulatory approval and successful commercialization.
>
> Specifically, molgramostim offers:
>
> • a strong product foundation that applies both a previously approved active drug
> substance class and drug delivery technology;
>
> • GM-CSF delivered directly to the lungs, the primary site of macrophage function
> deficiency in aPAP, which could result in clinical efficacy with limited systemic
> adverse effects;
>
> • a nebulizer system that provides a fast and convenient method of administration;
> this is highly desirable for long-term treatment in a chronic disease, such as aPAP;

---

[1] All emphasis herein has been added unless otherwise stated.

• a low patient impact therapy that can be carried out in the home in 3 to 5 minutes each day using the portable eFlow Nebulizer System;

• eligibility for strong market protection via orphan drug status, potential eligibility for biologic exclusivity that provides twelve years of total market protection in the U.S.;

• a proprietary cell bank used in the production of the drug substance; and

• an exclusive agreement for the specific device that is optimized for administration of molgramostim.

74.     The same day, the Company issued a press release reporting its 2023 full year financial results (the "FY 2023 Earnings Press Release"). The FY 2023 Earnings Press Release stated, in relevant part:

> "We look forward to reporting IMPALA-2 top line results at the end of the second quarter and, assuming positive data, anticipate filing the BLA in the first half of 2025," said [Defendant] Pauls[.] "2023 was a year of strong execution that included the on-time, over-enrollment of the Phase 3 IMPALA-2 trial and an analysis of a health claims database that identified ~3,600 currently diagnosed aPAP patients and another ~1,400 potential, currently undiagnosed, aPAP patients in the U.S. Additionally, we launched aPAP ClearPathTM, a simple, accurate, no-cost, labdeveloped GM-CSF autoantibody blood test, along with a disease state awareness campaign, that is educating U.S. pulmonologists about the disease and need for earlier testing. ***Finally, we completed an $80 million equity financing last July, and with $162 million in cash and investments and a track record of strong fiscal discipline, we believe we are capitalized into 2026***."

***April 26, 2024 Proxy Statement***

75.     On April 26, 2024, the Company filed a proxy statement on Schedule 14A the Company filed with the SEC (the "2024 Proxy Statement"). Defendants Pauls, Elam, Hawkins, van Es-Johansson, McCracken, and Ramsay solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

76.     The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Pauls, Elam, Hawkins, van Es-Johansson, McCracken, and Ramsay

to the Board; (2) approval of the Savara Inc. 2024 Omnibus Incentive Plan; (3) approve an amendment to the Company's Amended and Restated Certificate of Incorporation to allow for exculpation of officers as permitted by Delaware law; (4) ratify the appointment of RSM US LLP as the Company's independent registered public accounting firm for the 2024 fiscal year; and (5) approve, on an advisory basis, the compensation for the Company's named executives.

77.     The 2024 Proxy Statement noted that if Savara shareholders voted to approve the 2024 Omnibus Incentive Plan it would become effective immediately, as the 2024 Omnibus Incentive Plan was to replace the pre-existing incentive plan, which was set to expire in 2025. Further, the 2024 Proxy Statement notes the approval of the 2024 Omnibus Incentive Plan will cause an additional 11,700,000 shares of common stock to be made available under the 2024 Omnibus Incentive Plan for issuance. Per the 2024 Proxy Statement, as of April 8, 2024, there were 987,502 shares still available for grant under the prior plan, meaning that if the 2024 Omnibus Incentive Plan is approved, there would be a total of 12,687,502 available for grant. The 2024 Proxy Statement states that consultants, officers, advisors, non-employee directors, and eligible employees are available to participate in the 2024 Omnibus Incentive Plan, and that if the 2024 Omnibus Incentive Plan was not approved, the Company will not be able to grant further equity or equity-based compensation when the pre-existing plan expires in 2025. The 2024 Proxy Statement notes that "the effective use of stock-based long-term incentive compensation is essential for our company to maintain a balanced and competitive compensation program and important to our ability to achieve long-term business objectives."

78.     Regarding "Board Leadership Structure and Role in Risk Oversight," the 2024 Proxy Statement, stated, in relevant part:

> Our Board of Directors is responsible for oversight of risks facing our company, while our management is responsible for day-to-day management of risk. Our

Board of Directors, as a whole, directly administers its risk oversight function. In addition, the risk oversight function is also administered through the committees of our Board of Directors, which oversee risks inherent in their respective areas of responsibility, report to our Board of Directors regularly and involve the Board as necessary. For example, the Audit Committee oversees our financial exposure and financial reporting related risks, and the Compensation Committee reviews risks related to our compensation programs and practices and both such committees make recommendations to our Board regarding oversight of such risks. Our Board of Directors, as a whole, directly oversees our strategic and business risk, including product development risk and business continuity risk, through regular interactions with our management. We believe our Board's leadership structure supports its role in risk oversight, with our executive officers responsible for assessing and managing risks facing our company on a day-to-day basis and the members of our Board of Directors providing oversight of such risk management.

79.    Regarding the Company's Code of Ethics, the 2024 Proxy Statement provided:

**Ethics & Compliance.** We are committed to acting with integrity in every aspect of our business. We have adopted a Code of Conduct and require all employees to complete training on it. Additionally, we have established a toll-free hotline and web-based service to enable anonymous reporting of concerns regarding ethical issues or suspected violations of our policies. In 2023, no reports were submitted.

80.    Regarding the Company's Audit Committee, the 2024 Proxy Statement stated the

responsibilities, in relevant part, as:

- Reviewing and discussing, including with management and the independent auditor, the annual and quarterly financial statements;

- Reviewing any proposed significant changes to the accounting principles and practices;

- Review any material changes to the system of internal control over financial reporting;

- Reviewing management's report om the effectiveness of internal control over financial reporting and the independent auditor's audit of the effectiveness of Savara's internal control over financial reporting, if applicable;

*** 

- Overseeing the implementation and enforcement of our insider trading policy;

- Reviewing and evaluating any significant financial risk exposures facing Savara and the steps our management has taken to control and monitor such exposures;

81. Defendants Pauls, Elam, Hawkins, van Es-Johansson, McCracken, and Ramsay caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia:* (1) the BLA for MOLBREEVI lacked the CMC information that is required to complete the application; (2) as a result, the FDA was unlikely to approve the BLA for MOLBREEVI; (3) the timeframe in which the individual Defendants represented to investors that BLA for MOLBREEVI would be approved was unrealistic; (4) as a result of the delay of MOLBREEVI's BLA approval, there was an increased likelihood that the Company would need to raise additional capital; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Omnibus Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

82. The 2024 Proxy Statement also failed to disclose, inter alia, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

83. As a result of Defendants Pauls, Elam, Hawkins, van Es-Johansson, McCracken, and Ramsay causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Pauls, Elam, Hawkins, van Es-Johansson, McCracken, and Ramsay to the Board; (2) approve of the Savara Inc. 2024 Omnibus Incentive Plan; (3) approve an amendment to the Company's Amended and Restated Certificate of Incorporation to allow for

exculpation of officers as permitted by Delaware law; (4) ratify the appointment of RSM US LLP as the Company's independent registered public accounting firm for the 2024 fiscal year; and (5) approve, on an advisory basis, the compensation for the Company's named executives.

84.     As a result of shareholders approving the 2024 Omnibus Incentive Plan, the plan took effect immediately upon reaching shareholder approval. Additionally, there were 11,700,000 shares for issuance under the 2024 Omnibus Incentive Plan. The Individual Defendants, many of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Omnibus Incentive Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2024 Omnibus Incentive Plan in the future.

### *May 9, 2024 Earnings Press Release*

85.     On May 9, 2024, the Company issued a press release reporting its financial results for the first quarter of 2024 (the "1Q 2024 Earnings Press Release"). The 1Q 2024 Earnings Press Release quoted Defendant Pauls as stating, in relevant part:

> *"The IMPALA-2 trial remains on-track and we look forward to reporting top line results by the end of the second quarter,"* said [Defendant] Pauls[.] *"Following that, and assuming positive data, we expect to file a BLA in the first half of 2025.* Importantly, with $143 million in cash and investments, *we believe we are capitalized into 2026* which is well beyond the data read-out and includes investments in programs such as the extension of the IMPALA-2 open-label period from 48 weeks to 96 weeks, anticipated launch of a global Expanded Access program for molgramostim, build out of the U.S. Commercial infrastructure, and pre-Commercial preparations in Europe."

### *August 12, 2024 Earnings Press Release*

86.    On August 12, 2024, the Company issued a press release reporting its financial results for the second quarter of 2024 (the "2Q 2024 Earnings Press Release"). The 2Q 2024 Earnings Press Release represented that the Company had sufficient capital to last throughout 2026. Specifically, the 2Q 2024 Earnings Press Release stated:

> • In July 2024, further strengthened balance sheet with an ~$100M equity financing, which added ~$94M to the ~$122M in cash, cash equivalents, and short-term investments reported as of June 30, 2024; ***Company expects to be sufficiently capitalized through 2026.***

87.    The 2Q 2024 Earnings Press Release also quoted Defendant Pauls as touting the success of MOLBREEVI's clinical trial, stating that due to the success of the clinical trial, Savara was still on track to complete the BLA submission in the first half of 2025.

88.    Specifically, the 2Q 2024 Earnings Press Release stated, in relevant part:

> "***Following strong top line results in the IMPALA-2 trial, we plan to complete the BLA submission for MOLBREEVI, the trade name that the FDA has conditionally accepted for molgramostim, in the first half of 2025***," said [Defendant] Pauls[.] "In parallel, we are now significantly ramping up global market development activities and look forward to presenting this work, as well as data from the IMPALA-2 trial, during our investor webinar in September."

> [Defendant] Pauls continued, "***The IMPALA-2 data support our view that MOLBREEVI could fundamentally change the way aPAP is treated***. With approximately 3,600 currently diagnosed U.S. patients and literature suggesting prevalence may be underestimated, plus our increased focus on developing the aPAP market and the potential for MOLBREEVI to be the first and only approved therapy for aPAP in the U.S. and Europe, ***we believe the global commercial opportunity is significant."***

### September 27, 2024 Press Release

89.    On September 27, 2024, Savara issued a press release titled "Savara Announced Expanded Access program (EAP) for Molgramostim Inhalation Solution (Molgramostim) for Patients with Autoimmune Pulmonary Alveolar Proteinosis (aPAP)" (the "September 27, 2024 Press Release").

90.    The September 27, 2024 Press Release continued to represent that the Company expected to complete MOLBREEVI's BLA in the first half of 2025, stating, in relevant part:

"Expanded access is granted to investigational products that address a serious condition for which there are no comparable therapies available," said [Defendant] Pauls[.] "Given the high unmet need in aPAP, and positive results demonstrated in the Phase 3 IMPALA-2 clinical trial, we felt it was critically important to establish the Savara Early Access Program to allow eligible aPAP patients pre-approval access to molgramostim. *This program reflects our ongoing commitment to the global aPAP community and the goal of potentially delivering an effective therapy for patients with this rare lung disease as quickly as possible."*

*Savara plans to complete submission of a Biologics License Application to the FDA for molgramostim in aPAP in the first half of 2025.* Molgramostim has been granted Orphan Drug, Fast Track, and Breakthrough Therapy designations from the FDA, Orphan Drug designation from the European Medicines Agency and Innovative Passport and Promising Innovative Medicine designation from the UK's Medicines and Healthcare Products Regulatory Agency for the treatment of aPAP.

*November 12, 2024 Earnings Press Release*

91.    On November 12, 2024, the Company issued a press release reporting its financial results for the third quarter of 2024 (the "3Q 2024 Earnings Press Release").

92.    The 3Q 2024 Earnings Press Release provided investors with an update on the MOLBREEVI BLA, and further assured investors that the Company was well capitalized through the second quarter of 2027. Specifically, the 3Q 2024 Earnings Press Release stated, in relevant part:

"*After a productive pre-BLA meeting with the FDA, we are working diligently to initiate a rolling submission for MOLBREEVI by the end of this year, with plans to complete the BLA submission by the end of 1Q 2025—thus enabling a potential approval in the U.S. by the end of 2025, if priority review is granted*," said [Defendant] Pauls[.] "*BLA submission, coupled with the submission of the MAA to the EMA by the end of 2025, are major regulatory milestones that could bring us one step closer to providing aPAP patients in the U.S. and Europe with the first and only approved therapeutic option for this rare and debilitating lung disease*. In parallel, we are accelerating the build-out of our commercial capabilities, complimented by ongoing market development initiatives, to ensure the approximately 3,600 diagnosed aPAP patients in the U.S. get access to MOLBREEVI post-approval. *Lastly, after strengthening our balance sheet, we*

*believe our cash runway now extends from the end of 2026 through the second quarter of 2027."*

***December 18, 2024 Press Release***

93.    On December 18, 2024, the Company issued the MOLBREEVI BLA Announcement Press Release.

94.    The MOLBREEVI BLA Announcement Press Release announced that Savara had begun the BLA process for MOLBREEVI, stating, in relevant part:

> "*Given the positive results of the pivotal, Phase 3 IMPALA-2 trial, we believe MOLBREEVI demonstrates a favorable benefit-risk profile and could fundamentally change the way aPAP is treated,*" said [Defendant] Pauls[.] "*Initiation of the BLA is an important milestone in potentially addressing the unmet need in aPAP, for which there are no approved medicines in the U.S. and Europe. We look forward to working closely with the FDA throughout the review process and expect to complete the submission of the rolling BLA by the end of 1Q 2025*."

***March 6, 2025 Press Release***

95.    On March 6, 2025, Savara issued a press release titled "Savara Announced U.S. Launch of the aPAP ClearPath™ Dried Blood Spot Test to Detect Autoimmune Pulmonary Alveolar Proteinosis (aPAP)" (the "March 6, 2025 Press Release").

96.    The March 6, 2025 Press Release announced that the MOLBREEVI BLA was nearly complete, stating, in relevant part, "*[a]s we near the completion of our rolling BLA submission for MOLBREEVI™ in aPAP*, which is on track for the end of 1Q 2025, we are steadfastly committed to our goal of providing the aPAP community with the first and only approved treatment option in the U.S."

***March 26, 2025 Press Release***

97.    On March 26, 2025, Savara issued a press release titled "Savara Completed Submission of the Biologics License Application (BLA) to the U.S. Food and Drug Administration

(FDA) for MOLBVREEVI* as a Treatment for Autoimmune Pulmonary Alveolar Proteinosis (aPAP)" (the "BLA Completion Press Release").

98.     The BLA Completion Press Release announced that Savara had completed MOLBREEVI's BLA application and it was currently under review by the FDA. The BLA Completion Press Release further stated that the Company was on track to support a potential launch in early 2026, stating, in relevant part:

> "***Submission of the BLA marks an important milestone for the Company and the aPAP community***," said [Defendant] Pauls[.] "***We believe this unprecedented body of data demonstrates MOLBREEVI improves pulmonary gas exchange and the clinical symptoms associated with this rare lung disease. As part of the submission, Priority Review was requested and, if granted, would shorten the FDA's review to six months (from the standard ten months) following the Agency's acceptance of the application***. We look forward to continuing our dialogue with the FDA and extend our gratitude to the patients and physicians who participated in our clinical trials. ***Our commercial preparations are on-track to support a potential launch in early 2026***."

> ***March 27, 2025 Financial Reports***

99.     On March 27, 2025, the Company issued a press release reporting its fourth quarter and full year 2024 financial results (the "FY 2024 Earnings Press Release").

100.     The FY 2024 Earnings Press Release continued to tout the Company's capitalization as well as the potential launch of MOLBREEVI in early 2026, stating, in relevant part:

> "***Completing submission of the BLA is an important milestone in potentially addressing the significant unmet need of people living with aPAP, a rare and debilitating lung disease***," said [Defendant] Pauls[.] "***MOLBREEVI has the potential to be the first and only approved therapy for aPAP in the U.S. and Europe and could redefine the standard of care for the disease. If granted Priority Review, we could have a PDUFA date by the end of the year and are preparing for a commercial launch in early 2026***. Lastly, with approximately $196 million in cash, ***we are in a strong financial position and believe our cash runway extends through 2Q 2027***, excluding our recent debt financing which adds additional low-cost capital options to further finance the Company."

101.    The same day, the Company filed its Annual Report on Form 10-K with the SEC for the 2024 fiscal year with the SEC (the "2024 Form 10-K"). The 2024 Form 10-K was signed by Defendants Pauls, Lowrance, Elam, Hawkins, van Es-Johansson, McCracken, and Ramsay. The 2024 Form 10-K also included certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Pauls and Lowrance attesting to the accuracy of the 2024 Form 10-K and that the 2024 Form 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

102.    The 2024 Form 10-K continued to represent the Company's management capabilities, corporate strategy, and MOLBREEVI's "key advantages" as discussed in the 2023 Form 10-K. *Supra* ¶¶ 72-74.

### *May 13, 2025 Earnings Press Release*

103.    On May 13, 2025, the Company the 1Q 2025 Earnings Press Release. The 1Q 2025 Earnings Press Release continued to represent the Company's capitalization through the second half of 2027 and the potential launch of MOLBREEVI in early 2026.

104.    Specifically, the 1Q 2025 Earnings Press Release stated, in relevant part:

"***At the end of 1Q 2025, we announced the on-time submission of the MOLBREEVI BLA to the FDA for the treatment of autoimmune PAP and requested priority review***," said [Defendant] Pauls[.] "***If Priority Review is granted, we anticipate a PDUFA date by the end of the year and are preparing for a U.S. commercial launch in early 2026***. We are also on track to submit the MAA in both Europe and the U.K. by the end of the year. Lastly, with approximately $172.5 million in cash, and the optionality to further finance the company through access to low-cost capital from our recent debt financing, we are in a strong financial position and ***believe our current cash runway extends into 2H 2027, well beyond a U.S. launch.***"

105.    The statements contained in ¶¶ 70-74, 85-104 were materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the BLA for MOLBREEVI lacked the CMC information that is required to complete the application; (2) as a result, the FDA was unlikely to approve the BLA for MOLBREEVI; (3) the timeframe in which the individual Defendants represented to investors that BLA for MOLBREEVI would be approved was unrealistic; (4) as a result of the delay of MOLBREEVI's BLA approval, there was an increased likelihood that the Company would need to raise additional capital; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Omnibus Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times

## **THE TRUTH EMERGES**

106.    The truth emerged on May 27, 2025, when the Company issued the RTF Press Release. The RTF Press Release revealed that the FDA issued a Refusal To File letter to Savara due to the MOLBREEVI BLA lacking the required information related to MOLBREEVI's CMC.

107.    Specifically, the RTF Press Release stated, in relevant part:

Savara [. . .] today announced that the Company received an RTF letter from the FDA for the BLA of MOLBREEVI as a therapy to treat patients with autoimmune PAP.

***Upon preliminary review, the FDA determined that the BLA submitted in March 2025 was not sufficiently complete to permit substantive review and requested additional data related to Chemistry, Manufacturing, and Controls (CMC).*** The RTF was not the result of safety concerns, and the FDA did not request or recommend additional efficacy studies. Within the next 30 days, the Company intends to request a Type A meeting with the Agency. Typically, Type A meetings are granted by the FDA within 30 days of the request.

108.     Market analysts had a negative reaction to the RTF Press Release. For example, Guggenheim published a report on May 27, 2025 lowering its price target for Savara and noted the implications of the RTF letter, stating, in relevant part:

> • **CMC Delay Could Lead to Change in Molbreevi Manufacturing Strategy**: While Molbreevi is currently manufactured by GEMA (Private), as part of a strategy to ensure sufficient commercial product supply and build in manufacturing redundancy, Savara had already entered into an agreement back in Feb. 2024 with Fujifilm Diosynth Biotechnologies (Fujifilm; 4901-JP) to become their second source manufacturer. The company remains on track to complete the technologytransfer with Fujifilm in 3Q 2025, which will now be before their anticipated 4Q 2025 resubmission of the BLA. Management informed us that Fujifilm is already collecting the in-process testing data that the FDA is currently requesting, meaning that although SVRA could continue with their previous plan of filing a postapproval supplement for Fujifilm to serve as their second source manufacturer, they now potentially have additional optionality around which company will serve as the primary Molbreevi manufacturer. While a final decision cannot be made until the conclusion of their Type A meeting with the FDA, the company stated that their choice will be driven by which option provides them with the higher probability of regulatory success in the shortest time-frame. ***Given the RTF letter, we are lowering our POS for Molbreevi obtaining FDA approval.***
>
> ***
>
> • **Risks**: Savara finished 1Q 2025 with ~$172.5M in cash and cash equivalents on hand, with management continuing to believe they have sufficient capital to fund operations into 2H 2027. ***We do not expect Savara to be profitable on a continuing basis until 2028 and expect the company may raise additional capital, potentially through a secondary stock offering that could dilute the holdings of current investors. In addition, any delays in obtaining regulatory approval, bringing their drug to the market, challenges in obtaining proper reimbursement for the products, or poor commercial execution by Savara could lead to lower sales and market share, significantly impacting the company's valuation.***

109.     On this news, the price of the Company's stock fell $0.90 per share, or approximately 31.7%, from a close of $2.84 per share on May 23, 2025, to close at $1.94 per share on May 27, 2025.

## SUBSEQUENT DEVELOPMENTS

110.    After the Relevant Period, on August 13, 2025, the Company issued a press release reporting its financial results for the second quarter of 2025 (the "2Q 2025 Earnings Press Release"). The 2Q 2025 Earnings Press Release revealed that Savara planned to "***resubmit the [MOLBREEVI] BLA in December [2025]."***

111.    On October 31, 2025, Savara issued a press release announcing it had completed a public offering of its common stock and certain pre-funded warrants which resulted in net proceeds to the Company of approximately $149 million before deducting underwriting discounts, commissions, and other offering expenses. The Quarterly Report filed on Form 10-Q with the SEC on November 12, 2025 (the "3Q 2025 Form 10-Q"), revealed that the public offering resulted in net proceeds of $140 million after underwriting expenses and deductions. The 3Q 2025 Form 10-Q further stated that the Company's cash and cash equivalents and its short-term investments are sufficient to fund the Company's operations for at least the next twelve months following the filing of the 3Q 2025 Form 10-Q.

## DAMAGES TO SAVARA

112.    As a direct and proximate result of the Individual Defendants' conduct, Savara has lost and expended, and will continue to lose and expend, many millions of dollars.

113.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

114.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

115.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

116.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

117.    As a direct and proximate result of the Individual Defendants' conduct, Savara has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement.

## DERIVATIVE ALLEGATIONS

118.    Plaintiff brings this action derivatively and for the benefit of Savara to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Savara, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

119.    Savara is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

120.    Plaintiff is, and has been at all relevant times, a shareholder of Savara. Plaintiff will adequately and fairly represent the interests of Savara in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

121.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

122.    A pre-suit demand on the Board of Savara is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following six individuals: Defendants Pauls, Elam, Hawkins, van Es-Johansson, McCracken, and Ramsay (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to three of the six Director-Defendants that were on the Board at the time this action was commenced.

123.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

124.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls while three of the Individual Defendants engaged in lucrative insider sales netting proceeds of approximately $660,062. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and this excused.

125.    In addition, the Director-Defendant caused the 2024 Proxy Statement to call for a shareholder vote to approve of the 2024 Omnibus Incentive Plan. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2024 Omnibus Incentive Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2024 Omnibus Incentive Plan at the annual meeting of the stockholders on June 6, 2024, the previously existing plans were set to expire in 2025. For this reason, the Individual Defendants, including the Director-Defendants received material personal benefits that they otherwise would not receive but for the issuance of the 2024 Proxy Statement and the shareholders approving the 2024 Omnibus Incentive Plan that made 11,700,000 shares available under the Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

126.    Additional reasons that demand on Defendant Pauls is futile follow. Defendant Pauls has served as the Company's CEO since December 2020, the Chair of the Board since September 2020, and as a Company director since April 2017. The Company provides Defendant Pauls with his principal occupation, for which the Company compensates him handsomely. Thus, as the Company admits, he is not an independent director. As the Company's highest officer, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Defendant Pauls also signed the false and misleading 2023 and 2024 Form 10-Ks. Additionally, Defendant Pauls solicited the 2024 Proxy Statement, which contained false and misleading

statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2024 Omnibus Incentive Plan. Moreover, under the 2024 Omnibus Incentive Plan, Defendant Pauls is eligible to receive stock awards under the 2024 Omnibus Incentive Plan, thereby materially benefitting from the adoption of the 2024 Omnibus Incentive Plan. Further, Defendant Pauls' insider sales while the Company's stock was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the scheme. Moreover, Defendant Pauls is a defendant in the Securities Class Action. For these reasons too, Defendant Pauls breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

127.    Additional reasons that demand on Defendant Elam is futile follow. Defendant Elam has served as a Company director since February 2009. He also serves as the Chair of Compensation Committee and as a member of the Nominating and Governance Committee. The Company provides Defendant Elam with handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Elam personally signed the false and misleading 2023 and 2024 Form 10-Ks. Moreover, Defendant Elam solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2024 Omnibus Incentive

Plan. Moreover, under the 2024 Omnibus Incentive Plan, Defendant Elam is eligible to receive stock awards under the 2024 Omnibus Incentive Plan, thereby materially benefiting from the adoption of the 2024 Omnibus Incentive Plan. For these reasons, too, Defendant Elam breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

128. Additional reasons that demand on Defendant Hawkins is futile follow. Defendant Hawkins has served as a Company director since October 2010. Defendant Hawkins also serves as a member of the Audit Committee. The Company provides Defendant Hawkins with handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Hawkins personally signed the false and misleading 2023 and 2024 Form 10-Ks. Moreover, Defendant Hawkins solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2024 Omnibus Incentive Plan. Moreover, under the 2024 Omnibus Incentive Plan, Defendant Hawkins is eligible to receive stock awards under the 2024 Omnibus Incentive Plan, thereby materially benefitting from the adoption of the 2024 Omnibus Incentive Plan. Further, Defendant Hawkins' insider sales while the Company's stock was artificially inflated as a result of the false and misleading statements herein, further demonstrate his motive in facilitating and participating in the scheme. For these reasons, too, Defendant

Hawkins breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

129.    Additional reasons that demand on Defendant van Es-Johansson is futile follow. Defendant van Es-Johansson has served as a Company director since December 2019. Defendant van Es-Johansson also serves as a member of the Audit Committee and the Compensation Committee. The Company provides Defendant van Es-Johansson with handsome compensation for her role as a director. As a trusted, long-time Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Additionally, Defendant van Es-Johansson personally signed the false and misleading 2023 and 2024 Form 10-Ks. Moreover, Defendant van Es-Johansson solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of herself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2024 Omnibus Incentive Plan. Moreover, under the 2024 Omnibus Incentive Plan, Defendant van Es-Johansson is eligible to receive stock awards under the 2024 Omnibus Incentive Plan, thereby materially benefitting from the adoption of the 2024 Omnibus Incentive Plan. For these reasons, too, Defendant van Es-Johansson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

130.    Additional reasons that demand on Defendant McCracken is futile follow. Defendant McCracken has served as a Company director since October 2013 and as Lead Independent Director since December 2019. Defendant McCracken also serves as the Chair of the

Nominating and Governance Committee and as a member of the Compensation Committee. The Company provides Defendant McCracken with handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant McCracken personally signed the false and misleading 2023 and 2024 Form 10-Ks. Moreover, Defendant McCracken solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2024 Omnibus Incentive Plan. Moreover, under the 2024 Omnibus Incentive Plan, Defendant McCracken is eligible to receive stock awards under the 2024 Omnibus Incentive Plan, thereby materially benefitting from the adoption of the 2024 Omnibus Incentive Plan. For these reasons, too, Defendant McCracken breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

131.    Additional reasons that demand on Defendant Ramsay is futile follow. Defendant Ramsay has served as a Company director since April 2017. Defendant Ramsay also serves as the Chair of the Audit Committee and as a member of the Nominating and Governance Committee. The Company provides Defendant Ramsay with handsome compensation for his role as a director. As a trusted, long-time Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Ramsay personally

signed the false and misleading 2023 and 2024 Form 10-Ks. Moreover, Defendant Ramsay solicited the 2024 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of himself and the other Director-Defendants, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2024 Omnibus Incentive Plan. Moreover, under the 2024 Omnibus Incentive Plan, Defendant Ramsay is eligible to receive stock awards under the 2024 Omnibus Incentive Plan, thereby materially benefitting from the adoption of the 2024 Omnibus Incentive Plan. For these reasons, too, Defendant Ramsay breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

132.    Additional reasons that demand on the Board is futile follow.

133.    Defendants Ramsay (as Chair), van Es-Johansson, and Hawkins (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

134.    In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Ethics, the Director-Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Ethics and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

135.    Savara has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Savara any part of the damages Savara suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

136.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

137.    The acts complained of herein constitute violations of fiduciary duties owed by Savara's officers and directors, and these acts are incapable of ratification.

138.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Savara. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Savara, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

139.    If there is no directors' and officers' liability insurance, then the Directors will not cause Savara to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

140.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
**Against the Defendants Pauls, Elam, Hawkins, van Es-Johansson, McCracken, and Ramsay for Violations of Section 14(a) of the Securities Exchange Act of 1934**

141.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

142.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

143.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

144.    Under the direction and watch of the Defendants Pauls, Elam, Hawkins, van Es-Johansson, McCracken, and Ramsay, the 2024 Proxy Statement failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

145.    The 2024 Proxy Statement also failed to disclose that: the BLA for MOLBREEVI lacked the CMC information that is required to complete the application; (2) as a result, the FDA

was unlikely to approve the BLA for MOLBREEVI; (3) the timeframe in which the individual Defendants represented to investors that BLA for MOLBREEVI would be approved was unrealistic; (4) as a result of the delay of MOLBREEVI's BLA approval, there was an increased likelihood that the Company would need to raise additional capital; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Omnibus Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

146.    In the exercise of reasonable care, Defendants Pauls, Elam, Hawkins, van Es-Johansson, McCracken, and Ramsay knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement including, but not limited to, the re-election of the Director-Defendants and the approval of the 2024 Omnibus Incentive Plan.

147.    As a result of Defendants Pauls, Elom, Hawkins, van Es-Johansson, McCracken, and Ramsay causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Pauls, Elam, Hawkins, Es-Johansson, McCracken, and Ramsay to the Board; (2) approve of the Savara Inc. 2024 Omnibus Incentive Plan; (3) approve an amendment to the Company's Amended and Restated Certificate of Incorporation to allow for exculpation of officers as permitted by Delaware law; (4) ratify the appointment of RSM US LLP as the Company's independent registered public accounting firm for the 2024 fiscal year; and (5) approve, on an advisory basis, the compensation for the Company's named executives.

148.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2024 Proxy Statement.

149.    Plaintiff, on behalf of Savara, has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

150.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Savara's business and affairs.

152.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

153.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Savara.

154.    In breach of their fiduciary duties owed to Savara, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: the BLA for MOLBREEVI lacked the CMC information that is required to complete the application; (2) as a result, the FDA was unlikely to approve the BLA for MOLBREEVI; (3) the timeframe in which the individual Defendants represented to investors that BLA for MOLBREEVI would be approved was unrealistic; (4) as a result of the delay of MOLBREEVI's BLA approval, there was an increased likelihood that the Company would need to raise additional capital; and (5) the Individual Defendants were improperly interested in increasing their future compensation by seeking

shareholder approval of the 2024 Omnibus Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

155.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

156.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls, while three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $666,061.

157.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Savara's securities.

158.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Savara's

securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

159.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

160.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Savara has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

161.    Plaintiff, on behalf of Savara, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

162.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

163.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Savara.

164.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Savara that was tied to the performance or artificially inflated valuation of Savara or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

165.    Plaintiff, as a shareholder and a representative of Savara, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or

valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

166.    Plaintiff, on behalf of Savara, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Abuse of Control**

167.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

168.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Savara, for which they are legally responsible.

169.    As a direct and proximate result of the Individual Defendants' abuse of control, Savara has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Savara has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

170.    Plaintiff, on behalf of Savara, has no adequate remedy at law.

### FIFTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

171.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

172.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Savara in a manner consistent with the operations of a publicly held corporation.

173.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Savara has sustained and will continue to sustain significant damages.

174.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

175.    Plaintiff, on behalf of Savara, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

176.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

177.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

178.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Savara to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, to be subject to investigations and civil inquiries, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

179.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

180.    Plaintiff, on behalf of Savara, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Pauls and Lowrance for Contribution Under Sections 10(b) and 21D of the Exchange Act

181.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

182.    Savara and Defendants Pauls and Lowrance are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Pauls' and Lowrance's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

183.    Defendants Pauls and Lowrance, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

184.    Accordingly, Defendants Pauls and Lowrance are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

185.    As such, Savara is entitled to receive all appropriate contribution or indemnification from Defendants Pauls and Lowrance.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Savara, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Savara;

(c)     Determining and awarding to Savara the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Savara and the Individual Defendants to take all necessary actions to reform and improve Savara's corporate governance and internal procedures to comply with applicable laws and to protect Savara and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Savara to nominate at least three candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Savara restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: December 4, 2025

**THE BROWN LAW FIRM, P.C.**

*/s/ Elizabeth Donohoe*
Elizabeth Donohoe
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Gary Norman, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 3rd  day of December, 2025.

DocuSigned by:

1213672 7ECBB418...

Gary Norman